# IN THE COURT OF APPEALS OF IOWA

No. 17-1051
Filed June 6, 2018

IN RE THE MARRIAGE OF KIMBERLY ANN HACKETT
AND MICHAEL SEAN HACKETT

Upon the Petition of
**KIMBERLY ANN HACKETT,**
        Petitioner-Appellee,

**And Concerning**
**MICHAEL SEAN HACKETT,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Dubuque County, Monica L. Ackley,

Judge.


        The husband appeals the spousal-support, child-support, and attorney-fee

provisions in the dissolution decree. **AFFIRMED AS MODIFIED AND**

**REMANDED.**


        Kelsey J. Streinz of Kintzinger, Harmon, Konrardy, P.L.C., Dubuque, for

appellant.

        Jamie A. Splinter of Splinter Law Office, Dubuque, for appellee.


        Considered by Vogel, P.J., Bower, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**BLANE, Senior Judge.**

Michael Hackett appeals from the decree dissolving his marriage to Kimberly Hackett. Michael claims the district court's award of rehabilitative alimony at $1500 per month for seven years was inequitable, the court improperly used his former salary rather than current earnings to determine his child-support obligation, and the court abused its discretion when it ordered him to pay the full amount of Kimberly's attorney fees—including fees from her contempt action. Kimberly asks that we affirm the district court's decree and award her appellate attorney fees.

## I. Background Facts and Proceedings.

Michael and Kimberly were married in 2000 and became parents to twins in 2002.[1]

Before the parties married, Kimberly obtained a degree in hotel and restaurant management. When the parties first married, Kimberly was employed in the hospitality field and earned approximately $45,000 each year. After the twins were born in 2002, Kimberly ceased working outside of the home for a number of years. She returned to work part-time in 2007 and later, after the parties separated, began working outside of the home full-time in 2015. She anticipated earning $32,000 in 2017—her largest salary since leaving the workforce in 2002.

Michael is close to having sufficient credits for a college degree, but he never completed the necessary requirements. His lack of a college degree has not prevented him from rising within the publishing industry; in 2015, the last full

---

[1] The parties reached an agreement before the dissolution trial whereby they would share joint legal custody of the children and Kimberly would have care of the children, with Michael receiving liberal and reasonable visitation.

year of his employment with McGraw Hill, Michael earned $191,679.20 in taxable income.[2]

Michael was fired from McGraw Hill for conduct violating the company's "Travel & Expense Guidelines." According to the testimony of a human resource (HR) manager for the company, Michael's personal use of his corporate credit card was brought to the attention of Michael's manager in late 2015. After noticing excess charges for Amazon and iTunes, his employer refused to pay a number of his charges; Michael's manager discussed the issue with Michael in December of that year. As the HR manager testified, rather than seeing his spending habit on the company credit card improve after receiving a warning, "it got more questionable." When the company received and reviewed his next expense report, in February 2016, the company noted "duplicate" expenses—on a single weekend when Michael was traveling for work, Michael had charged four meals of room service to his hotel room at times he was actually in a meeting elsewhere. Michael later admitted he had taken his girlfriend with him on the work trip. Following an investigation into various charges on the corporate credit card, Michael was fired in May 2016.

The next month, Kimberly filed for dissolution. She also filed an application for temporary relief, asking the court to order Michael to pay spousal support and child support during the pendency of the dissolution. The application also noted

---

[2] Michael earned $172,179 in taxable income in 2013 and $240,562 in 2014. The HR manager testified Michael was earning approximately $160,000 in salary annually with a potential of a bonus "up to $40,000" at the time of his termination. It is unclear from the record what took place in 2014 that resulted in his earnings being so much greater than expected.

that the home expenses, such as the mortgage, needed to be paid and the family was without health insurance since Michael lost his employment.

The parties reached an agreement, which the court adopted by a Temporary Order in early August, whereby Michael agreed the money he received for unemployment—$425 weekly—would be given to Kimberly to pay the marital home mortgage. Additionally, Michael agreed to provide health insurance for the entire family, and the parties agreed the marital home needed to be sold, with Kimberly and the twins residing in the home until it sold.

By the parties' agreement, the issue of temporary matters was again brought to the court for a hearing in October.[3] Michael was still unemployed and, in its written order, the court noted Kimberly had "been profoundly struggling with no monetary assistance from" Michael. Although the parties cashed out Michael's 401k from McGraw Hill in June—approximately $110,000 in funds—Michael had not used any of those funds to pay the mortgage or support for the children; instead, he had "been frivolously spending money, eating out at expensive restaurants, traveling with and supporting his new girlfriend, who [was then] residing with him in a cottage in Galena." Additionally, Michael had "been pursuing a music career and play[ed] guitar in a band." He had also recently purchased a motorcycle and accoutrements for approximately $12,000.

The court ordered Michael to sell the motorcycle and use the proceeds to make payments for the children's school needs and child support. The court also ordered Michael to pay monthly child support of $2252, effective October 1. The

---

[3] Though the hearing was reported, we have no record of it.

court used Michael's "prior earnings" in reaching the amount owed. Additionally, in lieu of temporary support, Michael was ordered to pay the mortgage on the family home. At the time, it was believed Michael's parents were paying for the health insurance for the family.

In March 2017, Kimberly filed an application to show cause, alleging Michael had violated the court's October order nineteen times, including seven counts for his failure to provide insurance, one count for failing to turn over the motorcycle so Kimberly could sell it, six counts for failing to pay child support, four counts for failing to pay the mortgage, and one count for failing to close a bank account as ordered.

In early April, the dissolution trial and the contempt action took place contemporaneously. Kimberly testified that when the parties cashed out Michael's 401k, they agreed to divide the money into three equal parts. Each of them received one-third to do with as they pleased, and the final third was placed in a joint bank account to pay family bills, such as the home mortgage, the lease on their vehicles, and their cellular phone bills. Kimberly paid the bills with the one-third of the 401k set aside for bills until it ran out in October 2016. Between October and April, during which Michael had been ordered to pay certain family bills and child support, Michael paid child support one month and the mortgage one month. He did not make any of the other ordered payments. Kimberly testified she had to pay family bills from her third of the 401k she had received as her money and used all but $5000. Also during trial, Kimberly testified that though it was believed at the time of the October hearing on temporary matters that the family had health insurance coverage, Michael had not used the $5000 his parents gave him to pay

the insurance premiums. Instead, he deposited the money into his account and spent it on other things before the account was billed by the insurance company. The family was uninsured for a number of months, and during that time, Michael underwent back surgery. The family then had approximately $50,000 in medical bills as a result.

Michael testified that he became employed in January 2017. He was working as an independent contractor for a non-profit organization with a three-month contract for $25,000. At the time of the April trial, Michael testified his initial contract would be renewed the next week for a second three-month period; he was to be paid at the same rate on the second contract.

The parties agreed that their only assets were the marital home, which they were attempting to sell; Kimberly's 401k, which had a balance of $14,705; and the motorcycle Michael had purchased, which he had not yet sold. The house was initially listed for sale at the price of $525,000 but had been on the market for a number of months; at the time of trial the parties reduced the price to $479,900. The mortgage on the home was approximately $241,250.

In the dissolution decree, the court ordered Michael to pay child support in the monthly amount of $1784.55 plus $837.50 in cash medical benefit. The obligation is based on "his earning capacity" rather than his actual income. In doing so, the court noted that his earning capacity was much higher than his current contract pay and the "conduct that caused him to lose his employment was selfish and thoughtless as that relates to the impact it would have on his [twins]." Additionally, the court found that Michael's loss of job and decrease in earnings was a result of his "intentionally disregard[ing] his obligation to his family." The

court used incomes of $45,000 for Kimberly and $201,000 for Michael.[4]

Additionally, Michael was ordered to pay Kimberly rehabilitative spousal support in

the amount of $1500 for seven years. Kimberly was allowed to keep her entire

401k. The parties were ordered to split equally the future profits from the sale of

the marital home, but Michael was ordered to pay out of his half of the sale

proceeds all of the ordered payments he had failed to make under the temporary

matters order. He owed Kimberly $15,888 for the mortgage, insurance, and

vehicle lease payments; $13,510 in back child support; and $8263.50 in attorney

fees, "inclusive of the fees associated with the" contempt action. Michael appeals.

## II. Standard of Review.

We review a dissolution decree de novo. *In re Marriage of Hansen*, 886

N.W.2d 868, 871 (Iowa Ct. App. 2016). "Although we give weight to the factual

determinations of the district court, their findings are not binding upon us." *Id.*

(citation omitted).

## III. Discussion.

### A. Spousal Support.

Michael maintains the district court's award of rehabilitative[5] spousal

support to Kimberly of $1500 per month for seven years was inequitable; he takes

---

[4] It appears the court considered the alimony Kimberly was to receive as part of her income, which is within the court's discretion. *See In re Marriage of McKamey*, 522 N.W.2d 95, 99 (Iowa Ct. App. 1994) (providing the trial court with the discretion to determine if the deduction of alimony should occur under the present decree); *but see* Iowa Ct. R. 9.5(1)(a)(1) (providing, effective January 1, 2018, that "[i]f traditional or rehabilitative spousal support is to be paid in the pending matter, *it will be* determined first and added to the payee's income and deducted from the payor's income before child support is calculated" (emphasis added)).

[5] Formerly, rehabilitative alimony was distinguishable from permanent alimony in that the former was fashioned as a method "of supporting an economically dependent spouse through a limited period of re-education or retraining following a divorce, thereby creating

issue with both the amount and duration of the support. Michael concedes some alimony is warranted but does not specify what he believes is equitable.

In deciding to award alimony, the district court is to consider the factors in Iowa Code section 598.21A (2016). *See In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005). While our review of the district court's determination is de novo, "we give that court considerable latitude in making this determination based on the criteria" in section 598.21A. *Id.* And we "will disturb that determination only when there has been a failure to do equity." *Id.*

As relevant here, the factors to consider include:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and

---

an opportunity and incentive for that spouse to become self-supporting." *In re Marriage of Francis,* 442 N.W.2d 59, 63 (Iowa 1989); *see also In re Marriage of Wessels,* 542 N.W.2d 486. 489 (Iowa 1995).
> More recently, we noted:
> types of spousal support—whether categorized as traditional, rehabilitative or reimbursement—are not mutually exclusive. In fact, as we have stated, the moniker is nothing more than a "red herring." And "there is nothing in our case law that requires us, or any other court in this state, to award only one type of support" or to "characterize the support award as purely" one form or another. Rather, "[w]hat we are required to do is consider the factors mandated by the legislature contained in section [598.21A] when considering a spousal support award."

*In re Marriage of Stenzel*, 908 N.W.2d 524, 531 (Iowa Ct. App. 2018) (alterations in original) (citations omitted).
> In the case before us, Kimberly made a general claim for alimony, but she did not specify a need for re-education or retraining to become self-supporting. We therefore address the alimony issue based on the statutory factors and not upon the moniker assigned by the trial judge of being rehabilitative.

> the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
>
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
>
> g. The tax consequences to each party.
>
> . . . .
>
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1).

Here, both parties are in their mid-40s and in relatively good health.[6] Both were able to work full-time outside of the home and were doing so at the time of the dissolution trial. The parties were married almost seventeen years. While Kimberly had completed a college degree and Michael had not, Kimberly had left the workforce for a number of years after the parties' children were born. She had only recently—approximately two years before dissolution—returned to the workforce full-time and was earning $32,000 annually, which was the most she had earned since working full-time in 2002. Michael had made a number of advances in his career and earned $172,179; $240,562; and $191,679 in the three years before his termination from McGraw Hill. At the time of dissolution, he was set to start a second three-month employment contract with a nonprofit organization, which was paying him $25,000 for three months.

Here, the district court allowed Kimberly to keep her 401k, which had $14,705 in it and was largely derived from Kimberly's earnings before the parties were married. According to Kimberly, she began investing in it during the mid-

---

[6] Michael had back surgery during the pendency of the proceedings and testified his "days of lifting couches and digging ditches are probably done," but there was no indication the surgery had long-term implications as to his career in publishing or a similar field.

1990s and continued through the time she left the workforce in 2002—the parties had married in October 2000. The parties took some money out of the account in 2004 or 2005 to purchase a marital home, but no further action was taken with the account and Kimberly did not invest any additional funds after 2002. The only other assets the parties had were the marital home, in which they believed to have at least $200,000 in equity, and the motorcycle Michael purchased and valued around $11,000. The court ordered the parties to split the profits from the home sale evenly after the home sold. With part of his share of the proceeds, Michael was required to pay Kimberly the $29,400 he owed her for back child support and unmade mortgage payments, as well as $8263.50 for her attorney fees. The motorcycle was awarded to Michael in the property distribution.

Additionally, the district court considered the medical debt Michael incurred by failing to pay the insurance premiums as non-marital, and ordered Michael to pay it. We agree with the district court that the debt should be set aside as nonmarital. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 106 n.6 (Iowa 2007) ("[W]here the dissipation is debt, it is appropriate to set aside the debt for the spouse who incurred the debt and *not* include it in the marital estate."). Michael was court ordered to provide insurance for the family, and he represented to the family—and, based on the court's ruling on temporary matters, the court—that he had done so. Instead, he spent the money his parents gave him for the insurance premiums on other unnecessary expenditures. Then, while he was aware—or at least should have been aware—that the family was uninsured, Michael decided to undergo back surgery, incurring over $50,000 in medical bills.

Michael maintains Kimberly received more of the marital assets than he did, but neither Kimberly's 401k nor the medical debt were marital. And the money Michael owed Kimberly for his failure to make timely mortgage and child-support payments is not due to the court's division of assets. Thus, we will not reduce the amount of alimony Kimberly is to receive based on this property distribution. *See* Iowa Code § 598.21A(1)(c); *see also In re Marriage of O'Rourke*, 547 N.W.2d 864, 866 (Iowa Ct. App. 1996) ("We consider property division and alimony together in evaluating their individual sufficiency.").

At the time of the dissolution trial, Michael was employed earning more than three times the salary Kimberly was earning, and, based on his recent salary, his earning capacity was much greater still.[7] Kimberly was working full-time in the industry in which she had a degree. It did not appear she had the ability to earn more in the immediate future, as she needed a job with flexibility in scheduling so she should continue to care and provide transportation for the twins, who had more than four years left before they were to graduate high school.

Based on these circumstances, we cannot say either the amount or the duration of the spousal-support award was inequitable.

**B. Child Support.**

Michael maintains the district court was wrong to use his past income in determining his child-support obligation. He concedes that our case law provides

---

[7] "This standard of living during the marriage sets the highest level of spousal support but this sum must then be adjusted by the payee's income or earning capacity, whichever is greater." *Stenzel*, 908 N.W.2d at 533 (citing *In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015) ("In determining need, we focus on the earning capability of the spouses, not necessarily on actual income.")).

for using a parent's former salary in situations when the parent reduces "their earning capacity and ability to pay support through improper intent or reckless conduct," *In re Marriage of Foley*, 501 N.W.2d 497, 500 (Iowa 1993), but Michael maintains his actions that resulted in the termination his employment did not rise to that level.

Nothing in the record supports a finding Michael undertook his actions with the intent to deprive his children of support. We believe it is a closer question whether it was reckless to take his girlfriend with him on a work trip two months after he had already been warned by his boss about improper use of his corporate credit card. However, our appellate courts have previously found it was appropriate to use the parent's current salary in instances after the parent was terminated from their employment—even when the termination was a result of the parent's voluntary action. *See, e.g.*, *In re Marriage of Walters*, 575 N.W.2d 739, 743 (Iowa 1998) (reducing the father's child-support obligation after he was incarcerated even though the reduction in earnings was the result of a voluntary criminal activity); *Foley*, 501 N.W.2d at 500 (using the father's reduced salary to determine his child-support obligation after he was terminated for insubordination); *Nicolls v. Nicolls*, 235 N.W. 288, 290 (Iowa 1931) (using the father's reduced income after he was discharged from his job and was unable to find new employment with comparable pay); *In re Marriage of Knust*, No. 16-1664, 2017 WL 3283301, at *1 (Iowa Ct. App. Aug. 2, 2017) (using the father's new, lesser salary from his present employment after he was transferred to a lower paying job following a conviction for operating while intoxicated).

Moreover, in considering which salary should be used to determine his child-support obligation, "some consideration of [Michael's] earning capacity and ability to pay is necessary." *Walters*, 575 N.W.2d at 743. "[W]e must base our decision on reality rather than an unattainable utopia." *Id.* And here, where Michael's former salary was approximately two times greater than his salary at the time of the trial, we believe it is unrealistic to set his child-support obligation based on his former salary.

Because the district court should have used Michael's actual salary to set his child-support obligation, we remand to the district court to determine the child support "based on the present financial circumstances of the parties and the child support guidelines." *In re Marriage of Hoffman*, 867 N.W.2d 26, 37 (Iowa 2015).

**C. Trial Attorney Fees.**

Michael maintains the district court abused its discretion when it ordered him to pay Kimberly's attorney fees, including the fees for the contempt action.

We review an award of attorney fees for an abuse of discretion. *See In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997). Generally, the controlling factor in awards of attorney fees is the ability to pay. *Id.* As noted above, Michael was earning more than three times as much as Kimberly at the time of the dissolution trial. We cannot say the district court abused its discretion in ordering Michael to pay the attorney fees incurred for the dissolution—$7848.50.

However, the court erred in ordering Michael to pay the attorney fees— $365—and costs—$50—incurred in the contempt action. Iowa Code section 598.24 provides that "the party [who] is in default or contempt of the decree, the costs of the proceeding, including reasonable attorney's fees, may be taxed

against that party." But section 598.24 only applies when the grounds for the contempt relate to a violation of the decree, and here, the decree had not yet been entered. *See In re Marriage of Herbers*, No. 13-0668, 2014 WL 955292, at *6 (Iowa Ct. App. Mar. 12, 2014).

Thus, we remand for entry of a corrected order, requiring Michael to pay only the attorney fees incurred in the dissolution proceeding.

**D. Appellate Attorney Fees.**

Kimberly asks us to award her appellate attorney fees. An award of such fees is within our discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (citation omitted).

While Michael earns more than Kimberly does, he has also been largely successful on appeal. We decline to award Kimberly appellate attorney fees.

**IV. Conclusion.**

Upon our de novo review, we find the district court's award of spousal support equitable. Because the district court should have used Michael's current income to determine his child-support obligation, we remand for child support to be recalculated using the parties' current incomes. We also remand for entry of a corrected order removing Kimberly's attorney fees incurred in the contempt action. We affirm as modified and remand.

**AFFIRMED AS MODIFIED AND REMANDED.**